

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00105-CV

_____

IN THE INTEREST OF J.D., JR., AND C.D., CHILDREN

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 17C1324-102

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Jake's parental rights to his children, J.D., Jr., and C.D.,[1] were terminated by the trial court in Bowie County. Appealing, Jake urges ineffective assistance of counsel, error in a denied continuance, insufficient evidence on the best-interest finding, and insufficient evidence to support placement of the children with a non-relative. We affirm the trial court's judgment, because (1) ineffective assistance of counsel has not been established, (2) denying Jake's motion to continue the final hearing was discretionary, (3) sufficient evidence supported the trial court's best-interest finding, and (4) Jake's issue of non-relative placement is not separate from, or controlling over, the best-interests analysis.

Illegal drugs are usually accompanied by various repercussions. Andrea Smith, an investigator with the Texas Department of Family and Protective Services (the Department), testified that the Department first became involved with the family after receiving information that Jake and Kallie[2] had been using illegal drugs. Smith visited the family's home, where she talked with Kallie and observed the children. According to Smith, the children were dressed appropriately and well groomed, but they were "a little bit out of control when [she] was trying to talk to them." Smith stated that there were no signs of drug use in the home; however, she asked Kallie if she would agree to submit to a drug test. Kallie never took a drug test, and Smith lost contact with the family for several months after their initial meeting.

---

[1]We refer to the children by their initials and to their parents by fictitious names in an effort to protect the children's privacy. *See* TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2018).

[2]Kallie is the mother of the children; however, she is not the subject of this appeal.

Around September 2017, Smith made contact with "them," but spoke only with Kallie.[3] Kallie had moved into a house with her cousin, Donny Hancock. Again, Smith asked Kallie if she would submit to a drug test. Kallie complied with her request, and the test yielded positive findings for drug use. At that time, Smith filed a non-emergency removal. She explained, "We originally filed in for an order to participate[4] because we couldn't get them to drug test, but once I found her and talked with her, and she drug tested, then we filed in for a non-emergency removal." After completing her investigation, Smith "also did placement after removal." The children were initially placed with Hancock for the first weekend, however, there were allegations of sexual abuse against him, so they were placed with Crystal Acevedo, a paternal aunt. After the children were placed with Acevedo, Smith's involvement with the case concluded.

April Hill, a conservatorship supervisor, testified that the Department was granted temporary managing conservatorship of the children in November 2017.[5] According to Hill, "The case worker, Chanda Zachery, did have a phone conversation with Jake at the beginning of the case, and then the rest of the communication has been through letter, from the department and from him."

---

[3]Jake was in jail at that time.

[4]The original petition to participate in services was filed in August 2017.

[5]On October 30, 2017, the Department filed its first amended petition for protection of a child and suit affecting the parent-child relationship, alleging, among other things, that Jake (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E) (West Supp. 2018).

Hill detailed Jake's criminal history that began as early as 1985; included burglary, aggravated assault, and multiple drug convictions; and culminated with 2015 convictions of tampering with and fabricating physical evidence and manufacture and delivery of a controlled substance greater than four grams, but less than 200 grams. Jake was sentenced to five-years' confinement as a result of the 2015 drug conviction. Hill served some community supervision before being revoked and re-incarcerated around September 2017.

According to Hill, both parents were offered services from the Department and were court-ordered to complete the services.[6] Hill stated that the Department mailed all notices to Jake while he was in prison and that Jake stayed in touch with the Department "periodically."[7] Hill added, "[D]uring Ms. Smith's investigation, [Jake] was not incarcerated, and he also was not cooperating with the [D]epartment in the investigation, which is why they filed the order to participate." She continued, "Although by the time the order to participate was heard, and it had moved to the non-emergency, he was incarcerated."[8] Hill stated that Jake had not complied with any of the court-ordered services.[9] She also testified that Jake was aware of Kallie's drug abuse, "that she was

---

[6]The court order included, among other things, that Jake participate in, and complete, parenting classes, counseling, psychological evaluations, and random drug testing.

[7]When Hill was asked if Jake wanted to attend the final hearing, she responded that he did.

[8]Hill stated that Jake's projected release date from prison, according to the Texas Department of Criminal Justice, was September 17, 2019. Hill explained that Jake had met with the parole board in March 2018, but the board denied his request for parole, citing that he was a repeat offender, had excessive substance abuse issues, and "the length of time served by the offender was not congruent with the offense severity." Hill said Jake's next parole review date was scheduled for March 2019.

[9]According to Hill, the prison system offered parenting classes, substance abuse classes, Narcotics Anonymous (NA) meetings, celebrate recovery class, anger management class, and thinking error class. When asked if Jake participated in any of those classes, she responded, "I know that no certificate of completion has been filed with the Court provided by [Jake]. So my answer would be no, and if he had, he had not provided the proof of it."

4

using methamphetamines intravenously." "So I believe that that says that [Jake] knew the children were in danger in [Kallie]'s care." Hill also stated that both Kallie and Jake had a history with the Department based on neglectful supervision due to drug-related allegations; specifically, the use of methamphetamines.

According to Hill, in April 2018, the children were placed in a "fictive kinship" home[10] and were doing well. The placement family had a relationship with the children before the placement. Hill stated, "The children adjusted very well to [the placement home]. They've obtained all of their medicals, dentals, assessments, things like that. They are happy and healthy." Hill explained that the children referred to their placement caregivers as mom and dad and that they had done so without instigation from anyone. Hill said the children's behavior had improved dramatically in comparison to their behavior before their removal. The placement family was hoping to adopt the children. Hill stated, "I believe it would be in the best interest of the children for the parental rights to be terminated, for the department to be named permanent managing conservator of the children in order for the department to sponsor an adoption with the current placement."

According to Jordan Gabriel, who is a Court Appointed Special Advocate (CASA), the children were doing well in their current placement. "I would say that their current household has been the most stable, the most loving. This is where they've been thriving great. They're absolutely great right now."[11] When questioned about whether it was in the children's best interest

---

[10]This refers to a home of non-relatives to the children.

[11]Gabriel stated that the children had been in four or five different households before their current placement.

to place them with Jake's family members, Gabriel stated, "I do not think that their placement needs to be changed again. Right where they are, their behavior has improved greatly." Gabriel said that, when she was assigned to the case initially, the children "couldn't even sit and have a conversation. . . ." "They were always threatening to hit me." She continued, "[N]ow where they're at, they're excited to see me. They come and give me hugs." Gabriel also explained that the children were woefully behind with their vaccinations, stating that, "there was one appointment where they had six, maybe seven shots at one time." In addition, C.D.[12] was required to have several root canals. The dentist attributed C.D.'s dental problems to Kallie's use of methamphetamine. It was Gabriel's opinion that it was in the children's best interests to terminate Jake's parental rights.

Jake's sister, Crystal Acevedo, testified that, at the time of C.D.'s birth, Acevedo was aware that the Department had "a case" against Jake and Kallie due to their illegal drug use. Acevedo said that, during that time, Jake and Kallie submitted to drug tests, and the results of those tests showed that they were both positive for methamphetamine use. Acevedo conceded that Jake and Kallie were both ordered to participate in services, but that neither of them did so and neither discontinued their drug use.[13] According to Acevedo, however, Jake was good with the children, he supported their physical and emotional needs, and it was not in the children's best interests to terminate Jake's parental rights.

---

[12]C.D. was born in January 2014.

[13]During the hearing, Jake recalled that he made an appearance in court in 2017 and that he had been ordered to participate in services due to his illegal drug use. He also explained that, soon after appearing in court, he was arrested.

Acevedo stated that she would be willing to be a long-term placement for the children and that there were other family members who were willing to do so.[14] Acevedo explained that her husband, her two sons, and a daughter currently lived with her. One of Acevedo's sons had recently been arrested and charged with sexual assault of a child. In addition, Acevedo's brother, who was incarcerated at the time of the final hearing, was planning on living with Acevedo's mother on his release from confinement. In Acevedo's opinion, it was in the children's best interests for them to be placed with a family member, and not with "complete strangers."

Jake's mother, Betty Underwood,[15] testified that she and her husband had room in their home for the children. Underwood stated that she would take the children "in a New York minute," however, she had not had a relationship with the children since they had been removed from Acevedo's home.[16] In Underwood's opinion, the children had bonded with Jake. She also stated that, when Jake was released from prison, he could reside with her in her home.

Brenda Bright, who had known Kallie and Jake for approximately two years, testified that Jake and Kallie were good parents and that the children seemed bonded to them. Bright had never seen either Kallie or Jake use drugs in the children's presence. It was Bright's opinion that, after Jake was released from prison, he should be given an opportunity to work on his parenting skills.

---

[14]Gabriel questioned Acevedo's sincerity about being the children's placement because she previously had the children in her home, and "she was so willing to push them out of her home. [Gabriel] was receiving like harassing phone calls from [Acevedo's] husband that the children needed to be taken out of their home."

[15]At the time of the hearing, Underwood was seventy-five years of age. Underwood's husband, who was seventy years of age, had recently suffered serious health issues.

[16]Gabriel testified that Underwood had not contacted her in regard to being a placement for the children. In Gabriel's opinion, Underwood was not a stable or suitable placement for the children.

Jake testified that, before his incarceration, he had been involved in the children's lives and that he had provided them with food, clothing, and shelter. Jake explained that he had been incarcerated since September 19, 2017, that his calculated parole date was September 16, 2019, but that he was scheduled for a parole review and would have a response from the board by March 2019. Jake stated that, while in prison, he had participated in several classes and had received a certificate for the class "Changes." Jake said, "I've taken everything that I can to help me with me and the boys."

During the pendency of the case, Jake wrote letters to his caseworker, Zachery, and had also written to the trial court on one occasion and his lawyer on one occasion. Jake stated that he had done what he could to meet the requirements of the court's order to follow the service plan. He had not, however, taken parenting classes and had not attended NA or Alcoholics Anonymous. According to Jake, the unit in which he was being held did not offer the programs, or there was a waiting list to begin the class.

In addition, Jake testified that his criminal history, as it related to drugs, began in 2002. Jake explained that he had been using drugs for ten to fifteen years, and he described himself as being a drug addict or a "user" in 2012.[17] According to Jake, he had been arrested for manufacture and delivery of a controlled substance in 2015, at which time J.D., Jr., was approximately three-years-old and C.D. was around one year old. Jake stated that he was served with the Department's amended petition the beginning of September 2018. He asked the trial court to modify the

_____

[17]J.D., Jr., was born in July 2012.

8

children's placement to a family member and to deny the Department's request to terminate his parental rights.

After hearing the evidence, the trial court found that it was in the children's best interests to terminate Jake's parental rights and that there was legally and factually sufficient evidence to demonstrate that Jake had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E) (West Supp. 2018).

*(1)     Ineffective Assistance of Counsel Has Not Been Established*

Jake contends that his trial counsel was ineffective because she (1) failed to enter a special appearance for the purpose of bringing to the trial court's attention that the Department failed to properly serve Jake with process[18] and (2) failed to object to the Department's failure to provide him with a service plan.  According to Jake, trial counsel's actions resulted in the termination of his parental rights.[19]

---

[18]Rule 120a of the Texas Rules of Civil Procedure states, in part,

> Notwithstanding the provisions of Rules 121, 122 and 123, a special appearance may be made by any party either in person or by attorney for the purpose of objecting to the jurisdiction of the court over the person or property of the defendant on the ground that such party or property is not amenable to process issued by the courts of this State.

TEX. R. CIV. P. 120a.

[19]The record shows that the trial court appointed trial counsel during a hearing that took place on August 9, 2018.

In parental-rights termination cases in Texas brought by the Department, an indigent person has a statutory right to counsel. TEX. FAM. CODE ANN. § 107.013(a) (West Supp. 2018); *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). This statutory right to counsel also embodies the right to effective counsel. *M.S.*, 115 S.W.3d at 544. The standard used for parental-rights termination cases is the same as that used in criminal cases and is set forth in *Strickland. Id.*; *see Strickland v. Washington*, 466 U.S. 668 (1984). The right to effective assistance of counsel does not guarantee, however, "errorless or perfect counsel whose competency of representation is to be judged by hindsight." *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).

To prevail on his ineffective assistance of counsel claim, Jake must prove by a preponderance of the evidence (1) that his counsel's performance was deficient, that is, it fell below an objective standard of reasonableness and (2) that it is reasonably probable that, except for counsel's unprofessional errors, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694. To support a finding that Jake's trial counsel was ineffective, the trial record must affirmatively demonstrate his deficiency. *Berma v. Tex. Dep't of Family & Protective Servs.*, 265 S.W.3d 34, 43 (Tex. App.—Houston [1st Dist.] 2008), *pet. denied*, 264 S.W.3d 742 (Tex. 2008) (per curiam).

In reviewing trial counsel's performance, we consider the circumstances surrounding the case and focus primarily on whether the manner of his performance was reasonably effective. *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006). We give great deference to trial counsel's performance and indulge a strong presumption that his conduct falls within the wide range of reasonably professional assistance. *Id.* This includes the possibility that counsel's actions were strategic. *Id.*

10

If the record is silent regarding the reasons for counsel's actions, we do not engage in speculation to find ineffective assistance. *In re L.C.W.*, 411 S.W.3d 116, 127 (Tex. App.—El Paso 2013, no pet.). We find ineffective assistance only if the conduct is "so outrageous that no competent attorney would have engaged in it." *H.R.M.*, 209 S.W.3d at 111.

In assessing harm, we consider the totality of the circumstances and evidence presented to determine whether "there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. Failure to satisfy either prong of the *Strickland* test is fatal. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Thus, if an appellant fails to show that it is reasonably probable that the outcome would have been different with the wished-for performance by counsel, we need not determine whether trial counsel's actual performance was deficient. *Strickland*, 466 U.S. at 697.

In this case, Jake maintains that, but for his trial counsel's request for a bench warrant, which resulted in his appearance at the final hearing, the trial court would have lacked personal jurisdiction over him because he was never properly served with the Department's amended petition. One essential element in providing due process of law in any proceeding is notice that can be reasonably expected to let interested parties know an action is pending. *PNS Stores, Inc. v. Rivera*, 379 S.W.3d 267, 273 (Tex. 2012). Valid service of process is needed to get personal jurisdiction over a defendant.[20] *Furst v. Smith*, 176 S.W.3d 864, 868 (Tex. App.—Houston [1st

---

[20]"[T]he term 'service of process' has a well-established meaning. Service of process refers to a formal delivery of documents that is legally sufficient to charge the defendant with notice of a pending action." *In re J.P.L.*, 359 S.W.3d 695, 704 (Tex. App.—San Antonio 2011, pet. denied) (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700 (1988)).

11

Dist.] 2005, no pet.). Lack of service denies due process to a party and denies the trial court jurisdiction over that party. *In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012).

However, filing an answer places the answering party before the court and avoids the need for service of citation on that party. TEX. R. CIV. P. 121. Here, Jake concedes that he sent a letter to the trial court that was dated April 30, 2018. In that letter, Jake stated that he was serving a five-year prison term as a result of what he described as a "meth" charge. According to Jake, he was aware that Chanda Zackery was the children's caseworker. He explained to the court that the prison unit did not offer parenting classes, but that he had been involved with another program and that he had "asked the Unit Chaplain to sign [him] up for several classes . . . ." Jake also identified specific family members and friends who he believed would be good placement families for the children.[21] Jake explained that he was "ten months away from parole eligibility" and that if he was not granted parole, his release date would be November 21, 2019. Jake stated, "I am asking that you treat the letter as an informal Motion requesting my Parental Rights not be terminated . . . ." Jake closed his correspondence by signing the letter and setting forth his TDCJ address. The letter contained a handwritten notation, stating, "Filed 6-7-18 at 8 am Bobby Lockhart Judge 102 District Crt."[22] Next to that notation, in very similar handwriting, was "17 C 1324-102," which was the trial court cause number in this case. The district clerk file-marked the letter on October 30, 2018.

---

[21]Jake also included an address and telephone numbers for the suggested placement families.

[22]A "judge may permit the papers to be filed with him, in which event he shall note thereon the filing date and time and forthwith transmit them to the office of the clerk." TEX. R. CIV. P. 74.

Citing *Smith v. Lippman*, 826 S.W.2d 137, 138 (Tex. 1992), Jake states on appeal, "A letter that contains an acknowledgement of receipt and acceptance of citation and petition can be construed as an answer." He maintains, however, that, because his letter did not acknowledge the receipt and acceptance of citation, it cannot be considered an answer to the Department's amended petition.[23] We disagree. Although Jake's letter did not include a statement that he had received service of process, it did contain the parties' names, his prison address, his preferences for placement for the children, and finally, his appeal to the trial court that he be allowed to maintain his parental rights to the children. Because Jake's letter referred to the parties and many of the issues in the case, we find that it was an answer to the Department's petition. "An answer shall constitute an appearance of the defendant so as to dispense with the necessity for the issuance or service of citation on him." TEX. R. CIV. P. 121.

Any party may enter an appearance in open court. "Such appearance shall be noted by the judge on his docket and entered in the minutes, and shall have the same force and effect as if the citation had been duly issued and served as provided by law." TEX. R. CIV. P. 120. Thus, any defect in service is cured by a general appearance. *Summersett v. Jaiyeola*, 438 S.W.3d 84, 92 (Tex. App.—Corpus Christi 2013, pet. denied). Jake contends that, had his trial counsel not requested a bench warrant, he would not have made an appearance. According to Jake, trial counsel should have instead made a special appearance in an effort to bring to the court's attention

---

[23]In *Lippman*, the Texas Supreme Court addressed what qualifies as a proper answer by a pro se defendant in relation to the entry of a default judgment. *Lippman*, 826 S.W.2d at 137. The court "conclude[d] that a defendant, who timely files a pro se answer by a signed letter that identifies the parties, the case, and the defendant's current address, has sufficiently appeared by answer and deserves notice of any subsequent proceedings in the case." *Id.* at 138.

that he had not been served. But Jake had already submitted himself to the jurisdiction of the court via his above-referenced letter. Thus, filing a subsequent special appearance to argue the lack of jurisdiction over Jake would have been doomed.[24] In sum, Jake has not shown that there was ineffective assistance in his trial counsel's failure to make a special appearance on his behalf.

Jake also contends that his trial counsel was ineffective for failing to object to the Department's alleged failure to provide Jake with a service plan.[25] But the record is silent regarding the reasons for trial counsel's actions, and we may not engage in speculation to find trial counsel ineffective. *L.C.W.*, 411 S.W.3d at 127. This record does not establish that trial counsel's actions were "so outrageous that no competent attorney would have engaged in [them]." *See H.R.M.*, 209 S.W.3d at 111. Moreover, the trial court did not terminate Jake's parental rights for failure to comply with the service plan. Thus, even if we did find that counsel's actions relative to the service plan were somehow substandard, Jake has failed to show that he was thereby harmed.

We overrule this point of error.

---

[24]Moreover, Jake concedes that he was served with the Department's amended petition at the beginning of September 2018.

[25]Despite Jake's assertion that he never received a service plan, he mentioned the requirements contained in the service plan, and his efforts to comply with them, in his letter to the trial court and during his testimony at the final hearing.

*(2)     Denying Jake's Motion to Continue the Final Hearing Was Discretionary*

On the day of the final hearing, Jake twice moved for a continuance citing extenuating circumstances.[26] The court denied his motions and proceeded with the hearing. Jake contends the trial court erred by denying his motion for an extension of the dismissal deadline. A trial court's decision to grant or deny a motion for continuance is within the trial court's discretion. *See* TEX. R. CIV. P. 251. A trial court's denial of a motion for continuance will not be disturbed unless the record reveals a clear abuse of discretion. *State v. Wood Oil Distrib., Inc.*, 751 S.W.2d 863, 865 (Tex. 1988). We are not to substitute our judgment for the trial court's, but are to decide only whether the trial court's ruling was so arbitrary as to exceed the bounds of reasonable discretion. *Phillip Bros., Inc. v. Oil Country Specialists, Ltd.*, 709 S.W.2d 262, 265 (Tex. App.—Houston [1st Dist.] 1986, writ dism'd). A trial court abuses its discretion if its ruling is arbitrary, unreasonable, and without reference to any guiding rules and principles. *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996).

A motion for continuance shall not be granted except for sufficient cause supported by an affidavit, consent of the parties, or by operation of law. TEX. R. CIV. P. 251. If a party's motion for continuance is not made in writing and verified, then we will presume the trial court did not

---

[26]Section 263.401(b) states,

> Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child.

TEX. FAM. CODE ANN. § 263.401(b) (West Supp. 2018).

abuse its discretion. *Ohlhausen v. Thompson*, 704 S.W.2d 434, 436 (Tex. App.—Houston [14th Dist.] 1986, no writ). Here, the record does not contain a written motion or an affidavit; thus, Jake did not comply with Rule 251. As such, the trial court did not abuse its discretion in denying his oral motions. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986).

We overrule this point of error.

*(3)*     *Sufficient Evidence Supported the Trial Court's Best-Interest Finding*

Next, Jake contends that there was legally and factually insufficient evidence to support the trial court's finding that termination of Jake's parental rights was in the best interest of the children.[27] We find sufficient evidence in this record.

"The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *L.E.S.*, 471 S.W.3d at 920. Ordinarily, parents' fundamental rights include the right to decide about the care and the custody of their offspring. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *L.E.S.*, 471 S.W.3d at 920. To terminate parental rights, there

---

[27]"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that" termination of the parent-child relationship was in the best interest of the child. *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *H.R.M.*, 209 S.W.3d at 109; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266).

16

must be proof by clear and convincing evidence.[28]  *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014);

*L.E.S.*, 471 S.W.3d at 920.  We review the entire record to evaluate the evidence and strictly construe

the termination statutes in favor of the natural parent-child relationship.  *A.B.*, 437 S.W.3d at 500;

*L.E.S.*, 471 S.W.3d at 919–20.

Parental rights, though fundamental, must yield at times to the goal of protecting the child.

*In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003); *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994).  The

child's emotional and physical safety cannot be sacrificed on the altar of protecting parental rights.

*C.H.*, 89 S.W.3d at 26; *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.).

In determining the best interests of the child, courts consider the following *Holley* factors:

> (1) the desires of the child, (2) the emotional and physical needs of the child now
> and in the future, (3) the emotional and physical danger to the child now and in the
> future, (4) the parental abilities of the individuals seeking custody, (5) the programs
> available to assist these individuals, (6) the plans for the child by these individuals,
> (7) the stability of the home, (8) the acts or omissions of the parent that may indicate
> the existing parent-child relationship is not a proper one, and (9) any excuse for the
> acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see In re E.N.C.*, 384 S.W.3d 796, 807

(Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2018).  Further, we may

consider evidence used to support the grounds for termination of parental rights in the best-interest

analysis. *C.H.*, 89 S.W.3d at 28.

Jake contends the *Holley* factors weigh in his favor; however, instead of addressing those

factors, he maintains,

---

[28]Clear and convincing evidence is the level of proof that gives the trier of fact "a firm belief or conviction as to the truth of the allegations sought to be established." *L.E.S.*, 471 S.W.3d at 920.

> In the present case the children are placed with non-relative caregivers who did not have a relationship with the children before placement. There is no homestudy included in the record for the current home. Additionally, there is a court ordered placement with Brad and Jodi Watson, but the children appear to be placed in a different home in violation of that court order. The record does not contain information on how the placement of the children changed to the current placement. There was no testimony at trial about potential placements that are family or are caregivers identified by the parents who did have a relationship with the children before the trial.

In other words, Jake seems to contend that the Department failed to comply with administrative guidelines and that the children should have been placed with family members, rather than non-family members.[29] Jake then concludes that "the main factor that should be considered in the present case when evaluating whether there is sufficient evidence of the best [interest] of the children is the plans for the children by the agency seeking custody."

It is not necessary to prove all of the *Holley* factors as a condition precedent to parental-rights termination. *Id.* at 27. Evidence relating to a single factor may suffice in a particular situation to support a finding that termination is in the best interests of the children. *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.). When considering the children's best interest, we may consider that a parent is unable to provide adequate care for the children, lacks parenting skills, or exercises poor judgment. *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the children's best interests. *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.). Further, the amount of contact between the parent

---

[29]Jake also complains that the trial court failed to make an oral finding that it was in the children's best interests to terminate his parental rights. The court did, however, make a best-interest finding in its written order terminating his parental rights.

18

and the children and the parent's failure to provide financial and emotional support, continuing criminal history, and past performance as a parent are all relevant in determining the children's best interest. *C.H.*, 89 S.W.3d at 28. We will address only the *Holley* factors for which there is relevant evidence. *Holley*, 544 S.W.2d at 371–72.

Children need and desire stability and security to be emotionally and physically healthy; however, in this case, there is little evidence, other than Jake's own testimony that he provided food and shelter to the children, that Jake consistently provided for the children's emotional or physical well-being. To the contrary, the evidence showed that, because of Jake's past and continued drug use, coupled with his criminal history and his incarceration in prison, the children's emotional needs were not being met, and they were physically and emotionally endangered. Jake's drug use and repetitive arrests also resulted in the children being subjected to, at the very least, an extremely unstable home environment. This is evidenced by his current prison term, which was a direct result of a felony drug conviction. Although Jake assured the trial court that he had changed and would make good decisions for the children in the future, there was little, if any, evidence that he would follow through with his assurances.

On the other hand, the evidence showed that the physical and emotional needs of the children were being met in their placement home. There was testimony that their social skills had improved and that they were doing well in school. The children had also been taken to medical and dental appointments, which visits were long overdue. The evidence also showed that the placement parents were providing the children with a safe and stable home environment, and it is believed those needs will continue to be met in the future.

19

Although Jake explained that he wanted the children to be placed with a family member during the remainder of his incarceration, there was little, if any, evidence of Jake's plans for the children's future.[30]  Moreover, Jake had no excuse for his past actions, except to explain that he had used or abused illegal drugs for fifteen years.  As unfortunate as it may be, Jake's past behavior is likely indicative of his future behavior, that is, placing his own desires before his children's needs.  On the other hand, the children's placement family had indicated to the Department that their plans for the children's future included making the children a permanent part of their family through adoption.

Notably, Jake's illegal drug use was the precipitating factor in the Department's initial intervention and its request for Jake to participate in services.  In spite of that, Jake continued his drug use.  In sum, Jake's continued illegal drug use, even when he had been specifically warned of the consequences, shows his poor judgment and an inability or unwillingness to act in the best interests of the children.

Because the large majority of the *Holley* factors favor termination of Jake's parental rights, we find that there was sufficient evidence to support the trial court's best-interest finding.  We overrule this point of error.

---

[30]Likewise, Jake was unable to attend and complete any type of parenting class in prison.

*(4)*     *Jake's Issue of Non-Relative Placement Is Not Separate from, or Controlling over, the Best-Interests Analysis*

Jake maintains there was insufficient evidence to demonstrate that it was in the children's best interests to place the children with "non-relative, non-foster home caregivers . . . when there appear to be [family member] placements available, or at least placements that were not investigated appropriately . . . ."  However, placement with a relative is not a required step for the Department.  *See Rogers v. Dep't of Family & Protective Servs.*, 175 S.W.3d 370, 379 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd w.o.j.) (no duty to place child with relative before termination of parental rights).  The trial court's determination of where a child should be placed is a factor in determining the child's best interest, but the fact that placement will be with non-relatives, rather than with family members, is not a bar to termination.  *Id.*  A separate consideration of alternatives is not a requirement.  *Navarrette v. Tex. Dep't of Human Res.*, 669 S.W.2d 849, 852 (Tex. App.—El Paso, 1984, no writ).

We overrule this point of error.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice


Date Submitted:     February 20, 2019
Date Decided:       March 22, 2019


21